### REED v. MADDEN, Sheriff.
#### No. 10703.

Circuit Court of Appeals, Eighth Circuit.
Jan. 29, 1937.

Harry C. Blanton, U. S. Atty., of Sikeston, Mo. (Frank A. Thompson, Sp.

Asst. to Atty. Gen., on the brief), for appellant.

Forrest G. Ferris, Sr., of St. Louis, Mo. (Staunton E. Boudreau and Franklin Miller, both of St. Louis, Mo., on the brief), for appellee.

Before STONE, SANBORN, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

This is a proceeding under section 453 of title 28 U.S.C.A. which, so far as here pertinent, reads thus: "The writ of habeas corpus shall in no case extend to a prisoner in jail unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States."

Section 461, 28 U.S.C.A., provides that the hearing shall be summary, and that: "The court, or justice, or judge shall proceed in a summary way to determine the facts of the case, by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice require."

Appellant, the petitioner, was and is a duly commissioned Agent of the Bureau (formerly Division) of Investigation of the Department of Justice of the United States. He applied for this writ to procure his release from the custody of respondent Madden, sheriff of the city of St. Louis, Mo., by whom he was held under an indictment, returned in the circuit court of that city, charging him with manslaughter in causing the death of one Dessie Masterson. Appellant alleges that his acts, which form the basis of the charge against him, were done "in the performance of his duty in pursuance of the law of the United States." The Bureau of Investigation is the well-known department of the United States Government over which J. Edgar Hoover now presides, and whose activities have been enlisted to combat the epidemic of kidnapping and other major crimes with which all are familiar. The trial court at the hearing upon the writ entered the following judgment: "Petitioner remanded to the custody of the respondent, the Sheriff of the City of St. Louis, Missouri. In view of the ruling, the court conceives that it

cannot, with propriety, make a statement of facts or conclusions."

A somewhat extended statement of the events leading up to the indictment against appellant is essential to a desirable understanding of the issues. St. Louis county, Mo., adjoins the city of St. Louis. The latter is organized as an independent county and is not to be confounded with the former.

In April, 1931, Dr. I. D. Kelley was kidnapped in St. Louis county, of which Clayton is the county seat. Somewhat more than two years thereafter a number of persons were indicted for the kidnapping, among them one Bart Davit, said to have a criminal record, and a negro named Johnson who confessed, and was being held at the home of Deputy Sheriff Newbold for his protection, since the state intended to use him as a witness against his codefendants. In May, 1934, Johnson was killed at the Newbold home by machine-gun fire. St. Louis county authorities and others immediately appealed to the Federal Government for aid in apprehending those responsible for the murder of Johnson. The seriousness of the situation in the minds of the St. Louis county authorities may best be gathered by a recital of the substance of the several applications made to Washington for federal aid.

May 28, 1934, C. Arthur Anderson, then prosecuting attorney of St. Louis county, new Congressman from that congressional district, wired the Attorney General for aid in the matter of investigating and collecting evidence for the prosecution of the persons charged with the kidnapping, and for investigation of the recent murder of the witness Johnson. He stated that he could not stress too strongly the need of such assistance, and suggested a personal conference. A grand jury was then in session, and on May 29, 1934, Anderson wrote to the Attorney General inclosing a partial report of the grand jury requesting federal assistance in the matter of the Johnson murder. This report was made to the circuit judge in whose court the grand jury was serving, and was very urgent and impressive. It calls attention to the outrage committed by the murder of an important witness in a prosecution for a major crime. It was further presented that the sheriff of St. Louis county was handicapped by lack of funds, lack of deputies, and by an authority limited to the confines of his own county. It re-

quested aid not only for the preservation of law and order in Missouri, but also to check the growing use of state boundaries as an adjunct of crime. The report also contained this significant statement: "Information presented to this body indicates that the murderers and kidnappers are possessed of political alliances that will seek, and have sought, to thwart the prosecution of both the murderers and the kidnappers."

May 31, 1934, Circuit Judge Malloy mailed a copy of this grand jury report to the Attorney General and also to the President. In his letter to President Roosevelt, speaking of the kidnapping of Kelley and the murder of Johnson, Judge Malloy said: "The apparent peculiar relation of the two crimes and the dire emergency now confronting the law enforcement officers of St. Louis County and the State of Missouri would seem to warrant extraordinary methods and the employment of Federal Agencies."

In his letter to the Attorney General he made this statement: "The report appears to plainly indicate that the investigation of the case thus far made by the grand jury has revealed criminal organizations with interstate activities. The jury is comprised exclusively of outstanding citizens of this county." Hon. John J. Cochran, also a St. Louis. Congressman, supplemented these applications by a letter to the Attorney General in which he called attention to a recent law, enacted since the murder of Johnson, purporting to confer jurisdiction upon the government "in the event that a felony has been committed and those committing the felony have left the state." In a letter to the Attorney General, dated June 2, 1934, the prosecuting attorney also cited this federal fugitive bill (18 U.S.C.A. § 408e). While in Washington upon this matter, Mr. Anderson spoke first to Mr. Keenan, Assistant Attorney General in charge of prosecutions, who introduced him to the Attorney General, with whom the situation was discussed. The Attorney General referred him to Assistant Attorney General Stanley, who assured him that he would have federal assistance, and he was instructed to call on Agent Yearsley, at that time in charge of the Bureau's St. Louis office. The Attorney General was likewise informed that the Dyer Act (18 U.S.C.A. § 408) also was involved since the vehicle which brought the killers to St. Louis county came across the state line from Illinois.

At this time appellant was in charge of the office of the Bureau in Charlotte, N. C. Pursuant to the understanding above stated he was transferred to St. Louis, and placed in charge of the Bureau's office there. Mr. Franklyn F. Yearsley was his predecessor and continued in the office as an agent after his arrival. On his way to St. Louis, Reed stopped in Washington and conferred with Director Hoover and various administrative assistants, by whom he was made aware of the communications received by the Department from St. Louis county officials. Reed was then thirty-five years of age. He had attended the University at Richmond, Va., for two years prior to his army service, after which he continued his schooling and received his law degree from Georgetown University. He had been highly trained for this service of investigation and had been an agent in it for approximately ten years.

A few days after his arrival in St. Louis, Prosecuting Attorney Anderson came to his office, and conferred with him about the Kelley kidnapping case and the murder of Johnson. The application of federal statutes and the necessity of federal aid were discussed and stressed. Among other things, Reed was informed by Anderson that a stolen car had been used in the murder of Johnson; that he had information that the car which brought the gangsters to Missouri had been stolen in Illinois; that machine-gun slugs had been found in the body of Johnson; and that this gun was thought to be in the possession of some of the gang to which Bart Davit belonged. Later a man named Lowe, who was working as an investigator with a St. Louis newspaper, was sent to Reed by Anderson. Lowe stated that he believed he could ascertain the identity of the murderers of Johnson, through certain people in the county with whom he had contact. He also said he had received information that the machine gun used in the killing of Johnson had also been used in the so-called Kansas City Massacre; that it belonged to Bart Davit and was being kept by friends of Davit. At this time there was in the county jail of St. Louis county a man named O'Connor who had served about four months of a six months' sentence upon some minor charge. July 6, 1934, Reed received a telephone message from Anderson, stating that he had information which he believed would be of value. He had O'Connor brought into his office and

introduced him to Reed. O'Connor stated that for a period he had occupied the same "bull pen" with Davit; that Davit had got quite confidential with him; had told him about the machine gun, used to kill Johnson, which he intended to use again, when he "beat the rap," as expected. O'Connor thought he could get further information, and shortly thereafter Anderson had him paroled. O'Connor's statements tallied closely with the information previously received by Reed from Anderson and Lowe. He stressed the fact that an automobile which had been stolen in Illinois had been used in the killing of Johnson. O'Connor named the people who were connected with this affair, among them two men named Britt and Winters; the latter, he said, had the machine gun. When tested he picked out pictures of Britt and Winters among others placed before him. He told Reed that Winters had come over from East St. Louis, and he thought he could find him through a house subsequently identified as number 1446 Hogan street in St. Louis, which Winters had frequented in the past. It later transpired that the apartment in this house, to which O'Connor referred, was then occupied by one Harry C. Masterson and his family. Reed said he would find out if Winters was still going to that house, but to this O'Connor strongly objected, on the ground that it was a bad neighborhood, and that an advance investigation would excite suspicion and defeat success. He also expressed apprehension for his own safety if the suspicions of the gang were aroused. He made for Reed a crude diagram of the premises, and said, "If he (Winters) is there I will find out and let you know." He said finally: "If I find that Winters is there at that same place with the machine gun I will call you (by telephone) and say 'The stuff is there.'" This was agreed upon.

On the night of July 13, 1934, his office advised Reed that O'Connor had just telephoned and had said: "Tell Mr. Reed the stuff is·here. Mr. Reed will understand." It was then about 9 o'clock. Reed hastened to his office and assembled men from the St. Louis police department and from the office of the sheriff of St. Louis county. He told those present what information he had and from whom. Sergeant Immken thereupon felt it necessary to telephone for more men and two detectives responded. It was then agreed that Mr. Yearsley, Sergeant Immken, and Detective Haberding should accompany Reed to the front;

Sergeant Doherty and Detective McCarthy were to cover the rear of the residence, and Deputy Sheriffs Willman and Newbold were to cover the vestibule. Up to this point there is no conflict in the testimony.

The entrance to the house is through a shallow vestibule, about three feet in depth and seven feet in width. The apartment in question, at which Winters was expected to be found, was on the right off the hall which ran through the building and separated the first floor apartments. From the vestibule a double door, with a loose latch, enters into this hallway, and the door leading into the front room of the apartment in question, which we may call the Masterson Apartment, was situated on the right of the entrance to the hallway and about six feet therefrom. Reed testifies that he passed through the vestibule into the hallway and took his position in front of this door leading into the apartment, with Sergeant Immken at his right; that he did not notice the identity of others who entered; that he knocked on the door and said, "We are officers, open the door"; that Sergeant Immken rapped on the door and said, "Police, open the door," or, "Open up"; that simultaneously with the rapping the door was opened a very few inches. A dim light from the street enabled him to get a brief glimpse of a man's body. The door was then slammed quickly and loudly, and, simultaneously with the slamming, "right here on my right, in front of me, approximately at the crack of the door, and the door knob where the door was closed—shots rang out and bursts of fire, two or three shots; I fix it at two shots." Reed says he thought the man on the inside was shooting his way out, and the first thing that occurred to him was to protect himself and those he had taken there with him. He drew his pistol and fired twice, shooting at the crack of the door. He says he fired no other shots; but, "immediately following my shots there seemed to be one or two more, right after mine." Thinking some one might come out at a lower entrance, he says he turned and looked down the hall toward the rear exit and saw a shadow pass over the platform of the rear porch. On reaching the rear door of the building he found no officers there and none were in the hall. All were assembled outside near the front entrance. Later Masterson came out from the rear room of the apartment in response to the repeated demands of the police officers, and it was found that Mrs. Masterson

had been struck by a bullet from which she died. It was found that three shots of 38-caliber had been fired through the door of the apartment, and one, of 45-caliber, was found to have entered the jamb of the door at an angle and could not be recovered. Three 38-caliber bullets were found in the front room of the apartment. There was no physical evidence of any bullets fired from the apartment.

Sergeant Immken testifies that, as planned at Reed's office, Reed, Yearsley, Haberding, and himself were to enter the front of the building, but that he had entered neither hall nor vestibule prior to the shooting. All of the police officers and deputy sheriffs denied entering the building before the shooting, and, with the exception of Newbold, denied firing at any time. All these officers, except Newbold, carried 38-caliber revolvers. Newbold had a weapon of 45-caliber. The testimony concerning the shot or shots fired by Newbold is confusing and unsatisfactory. When the police were making their report that night he did not tell them he had fired. Later he admitted firing one shot. He says he heard four or five shots, then heard Reed call out, "I am cornered." He claims, then, that he ran over to the south side of the entrance and fired a shot into the dark hallway in order, as he says, to protect Reed from further attack. Apart from the futility, as well as the danger to others attending such a shot, Reed concededly was not cornered, and no one else heard such words uttered by him. Furthermore, Newhold testifies that, when he fired, Detective Haberding was on his left and Sergeant Immken on his right at the vestibule entrance, which was less than three feet wide. Neither of these officers saw Newbold shoot, nor knew of his shooting. Concededly not less than four shots were fired. The majority of the witnesses place the number at five or six, and some even more than that. The firing was heard by a number of people congregated at a drug store a little more than 100 feet distant. A majority of all the witnesses say that this firing consisted of three blasts with short periods between them. Reed testifies that he shot but twice, and preserved his empty shells, sealed up, in proof. In this he was corroborated by Yearsley, and his testimony on this point was uncontradicted. He tendered his revolver for examination and keeping to Police Officer Fierce, who declined to receive it.

Reed's testimony that others entered the hall with him receives corroboration from various sources. As has been stated, the plan agreed upon at Reed's office was that Reed, Yearsley, Detective Haberding, and Sergeant Immken were to enter the front. Immken so testifies. A number of the witnesses state that, at the time of rapping on the door, they heard the words "police officers" used. The following quotation from the testimony of deputy sheriff Willman states the situation in this respect: "I know, I am positive that I heard Mr. Reed's voice in the hall there when I heard this announcement being made before each of the doors; now whether I would be able to recognize the other ones I don't know. I think there were a number of voices. I know they announced they were Police Officers, or 'Open up'; they did announce that they were Police Officers. They did announce that they were police officers. Mr. Yearsley and Mr. Reed are not police officers; they are agents of the Department of Justice. The detectives are known as 'Police officers.' "

The entire testimony leads to the conclusion that other persons with Reed entered the hall at the outset, though none of the officers would identify such. Reed said Immken was beside him on the right. Immediately after he fired he states: "I heard some stumbling and shuffling to my right and I thought one of the other officers had been hit; the shuffling kept on moving as though they were going to the front door." Immediately thereafter the hall was vacant except for Reed. This testimony receives corroboration from the witness Davis, who occupied the apartment across the hall. He was asleep when the first shots were fired. He says, "I was awoke, sounded like two or three people were wrestling in the hall, or scuffling." After that he heard four shots fired. It would seem incredible that Reed, after summoning eight other local officers to his aid, and making a specific plan as to their stations at the premises, should have entered this hall alone. He was not unmindful of the potential danger. He says: "I believed that Jack Winters was in there with a machine gun. At that time I knew of the reputation of Jack Winters and his associates; I knew his criminal record showed he had been associated with Tommy Carroll; and Tommy Carroll was an associate of Dillinger and a notorious gangster connected with a shooting and killing at Waterloo,

Iowa. I got that information from the criminal records."

At the hearing of this appeal counsel for appellee placed special emphasis upon the contention that appellant was negligent in relying upon the information received from O'Connor to the extent stated, and in failing to ascertain in advance whether Winters was there, or likely to come there. It is submitted that such a so-called investigation would have been ineffective, and likely to arouse suspicion, and lead to defeat of the undertaking. Winters was not a resident there, but was supposed only to visit the place when he came across the border from Illinois. The ascertainment that Masterson, an ex-convict, lived there would not have rendered the Winters visit improbable. We think appellant was entitled to rely upon O'Connor from the information he had received from Anderson. Upon this point the former prosecuting attorney stated at the hearing:

"In answer to your question as to whether I had made any investigation or caused any investigation to be made as to the reliability of O'Connor, I will say that I had been informed by St. Louis police officers that he had been very helpful to them in other cases; that he had given them information that led to the arrest and conviction of some jewel robbers in East St. Louis. * * *

"The police told me just what I told Mr. Reed, that he had been very, very helpful in solving a jewel robbery on the East side."

. The testimony of Police Lieutenant Murphy confirms this view. He says (referring to a visit he had made to Anderson's office, while O'Connor was confined):

"I asked O'Connor if he was celling with Bart Davit who also was in the St. Louis County jail for the Kelley kidnapping; he told me that he had been; I asked him did Davit let go to him any information concerning the Kelley case and he said, no, he had not, so I told him if he secured any information to get in touch with either me or the authorities in the county and they would let me know. * * *

"In solving three jobs I found the information given me by O'Connor had been reliable, in that particular case. That was the jewelry robbery on the East side, in Granite City. I also mentioned two other jobs. I gave that information to Mr. Anderson; I told Mr. Anderson he was in-strumental in clearing up a jewelry robbery for us, and I said, 'He may help you out here.'"

It seems clear from this record that appellant in this matter was engaged in the performance of his duty, under the direction of his department of the federal government in pursuance of the law of the United States, that he had reasonable ground to rely and act upon the information he received from O'Connor, and that he, in good faith, believed that his life and the lives of those for whose presence he felt responsible were in danger, and that the action complained of here was taken in that belief. After the shooting Immken says he heard Reed say: "Look out he has got a gun." When Masterson came out, Reed says that he (Reed) said, "Why did you shoot at me?" and Masterson confirms this in substance. He says Reed asked him "'Who done that shooting?' I said 'nobody here; somebody out there in the hall.'" The only ground for an assignment of negligence must be that the shots fired by him were not justified by any reasonable apprehension of danger on his part. The only possible ground upon which it could be made to appear that one of Reed's shots caused the death of Mrs. Masterson is the contention that no one but Reed fired into the room. This must be established, if at all, in the face of Reed's uncontradicted testimony that he fired but two shots, and upon the somewhat negative testimony of the various officers that they did not fire at all. But it appears overwhelmingly from the record that at least four shots were fired, and probably more than that.

The pertinent principle of law with respect to the degree of negligence essential to the crime of manslaughter is well stated by the Supreme Court of Missouri in State v. Melton, 326 Mo. 962, 33 S.W.(2d) 894, 895: "To make negligent conduct culpable or criminal and make it manslaughter, the particular negligent conduct of the defendant must have been of such a reckless or wanton character as to indicate on his part utter indifference to the life of another who is killed as a result thereof. Thus only may the criminal intent, so essential in a criminal prosecution, properly be found by the jury."

It is difficult to ascribe to Reed either any intent to injure, or this essential degree of wanton and reckless conduct, under the circumstances and conditions by which he was surrounded. Of course, the death of Mrs. Masterson was most un-

852

fortunate and regrettable. We are compelled, however, to view the case from the standpoint of the legal principles involved in a presentation of this nature. "Public prosecutions are not devised for the purpose of indemnifying the wrongs of individuals, still less of retaliating them." In re Neagle, 135 U.S. 1, loc. cit. 74, 10 S.Ct. 658, 672, 34 L.Ed. 55.

■ The general law governing the disposition of applicants under writs of this nature is not out of mind.

"The rule has been firmly established by repeated decisions of this court that the power conferred on a federal court to issue a writ of habeas corpus to inquire into the cause of the detention of any person asserting that he is being held in custody by the authority of a state court in violation of the Constitution, laws, or treaties of the United States, is not unqualified, but is to be exerted in the exercise of a sound discretion. The due and orderly administration of justice in a state court is not to be thus interfered with save in rare cases where exceptional circumstances of peculiar urgency are shown to exist." United States ex rel. Kennedy v. Tyler, 269 U.S. 13, 46 S.Ct. 1, 3, 70 L.Ed. 138, citing a number of cases among which is Ex parte Royall, 117 U.S. 241, 250, 253, 6 S.Ct. 734, 741, 29 L.Ed. 868, which may be regarded as the leading case in this regard.

■■ In Ex parte Royall it is held that the discretion of the trial court whether it will discharge the petitioner in advance of his trial in the court in which he is indicted, is "subordinated to any special circumstances requiring immediate action." The crucial question then presented is whether such special circumstances of peculiar urgency exist. It seems to us clear that Reed was engaged in the performance of his duties under the laws of the United States to which he had been assigned by his department at the urgent request of the local state authorities, who felt that their efforts were being obstructed by so-called political alliances that had sought and were seeking, to thwart the prosecution of both murderers and kidnappers. This statement came from the grand jury, composed of "outstanding citizens" of the county. The circuit judge felt that a "dire emergency" confronted the law enforcement officers. Of the situation there existing Reed was made fully aware. He knew the character of the men with whom he was expected to deal—notorious gangsters, and their associates, with whose records, in general, the entire public is familiar. He thought Winters was there and was undertaking to "shoot his way out," in accordance with a policy that has resulted in the death of bandits and officers alike in the efforts, largely successful, that have been made to suppress the major crime that has been, and still is, shocking the country.

We feel that an urgency exists which justifies action by this court under the section of the statute here invoked. By this we mean no reflection upon the tribunals of the state, nor upon the judgment of the learned trial judge, who, refraining from comment, has elected to dispose of this case in conformity with his understanding of the general rule announced in the decisions of the Supreme Court. We think this case falls within the exceptions cited. The appellant was acting in good faith under the laws of the United States, and at the direction of his superiors; evidence of criminal intent and wanton disregard of human life is lacking. He was confronted by a serious emergency. What he did, he believed to be necessary for the protection of himself and others. This court, on this appeal, must "determine whether the officers acted wantonly and with criminal intent, or whether, in so far as their acts may be regarded as wrongful, they were mere errors of judgment." In re Lewis (D.C.) 83 F. 159, 160.

"The arrest of federal officers or other persons for acts lawfully done in discharge of their duties under federal laws impairs to a certain extent the authority and efficiency of the general government." Campbell v. Waite (C.C.A.8) 88 F. 102, 108. This is an opinion by Judge Thayer, which admirably discusses all features of the law as presented in later decisions.

In the presentation of this case by appellee, we are impressed by the evident purpose to appeal to sympathy and prejudice because of the unfortunate death of Mrs. Masterson, which all must regret and to visit retaliation upon Reed, who is pictured as a heartless raider indifferent to human life. In his brief counsel for appellee says: "He (Reed) placed himself at that dwelling house door in the willful state of mind to shoot into the room at the first movement of a person inside."

We find in the record no justification for that statement. To ascribe such a state of mind to an agent of experience and training is remarkable to say the least.

Such an attitude on the part of the prosecution would tend to warp the minds of a jury from the controlling issues in the case. The danger to the efficient exercise of federal powers where a prosecution in a state court of federal officers, engaged in the discharge of their duties under laws of the United States, is or may be instigated by local passion or prejudice is pointed out in In re Loney, 134 U.S. 372, 375, 10 S.Ct. 584, 33 L.Ed. 949.

In Boske v. Comingore, 177 U.S. 459, 466, 20 S.Ct. 701, 704, 44 L.Ed. 846, the Supreme Court, after citing Ex parte Royall and the exceptions therein stated, said of the case before it: "The present case was one of urgency, in that the appellee was an officer in the revenue service of the United States whose presence at his post of duty was important to the public interests, and whose detention in prison by the state authorities might have interfered with the regular and orderly course of the business of the department to which he belonged."

It was pointed out that in such cases the courts of the United States have frequently interposed by writs of habeas corpus and discharged applicants held under state authority. To do otherwise, when justified or required by the circumstances to do so, "would be to establish a practice under which the jurisdiction of the federal courts and the personal freedom of their officers would be relegated entirely to the decision and custody of the courts of the states." Anderson v. Elliott (C.C.A.4) 101 F. 609, 613. While it is true that it has been generally held that In re Neagle, supra, presented circumstances of exceptional urgency, nevertheless the following language, which we think is pertinent here, has received general acceptance: "If the duty of the United States to protect its officers from violence, even to death, in discharge of the duties which its laws impose upon them, be established, and congress has made the writ of habeas corpus one of the means by which this protection is made efficient, and if the facts of this case show that the prisoner was acting both under the authority of law and the directions of his superior officers of the department of justice, we can see no reason why this writ should not be made to serve its purpose in the present case."

Finally, under the facts here presented, we do not think there is occasion for any further trial in the state court or in any court. In re Neagle, 135 U.S. 1, loc. cit.

75, 10 S.Ct. 658, 34 L.Ed. 55. But, apart from this, the subjection of this federal officer to state jurisdiction under such circumstances would almost certainly impair the authority and efficiency of the general government in its combat of crime conditions. In our judgment, upon the record, for several reasons, a peculiar urgency exists which demands the discharge of appellant under this writ. It is at least doubtful whether a new application or a writ of error to the Supreme Court would afford adequate protection in a case like this.

Accordingly the judgment below is reversed, and the cause is remanded to the District Court with directions to discharge appellant. It is so ordered.